UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNION BANK, N.A.,

                Plaintiff,

      - against -

CBS CORPORATION,

                Defendant.

08 Civ. 08362 (PGG)

MEMORANDUM DECISION
AND ORDER

PAUL G. GARDEPHE, U.S.D.J.:

        This action arises from a dispute concerning an investment account that CBS Corporation maintained at Union Bank, N.A.[1] (the "Bank"). The account was invested in the The Reserve Primary Fund ("Reserve Fund"), a money market fund that "broke the buck" as a result of losses sustained from holdings of Lehman Bros. debt securities. On September 15, 2008, CBS directed the Bank to liquidate its holdings in the Reserve Fund and to wire transfer the proceeds to its account at JPMorgan Chase ("Chase"). After receiving a communication from the Reserve Fund that day indicating that CBS's investment had been redeemed and that the proceeds would be forwarded to the Bank – but before actual receipt of those proceeds – the Bank wire transferred the full amount of CBS's Reserve Fund investment to CBS's Chase account. The Bank alleges that the Reserve Fund did not in fact wire transfer those proceeds to the Bank on September 15, 2008, and distributions from the Fund were subsequently frozen due to losses associated with the collapse of Lehman Bros. The Bank demanded that CBS repay it for the proceeds not received from the Reserve Fund, but CBS refused.

---

[1] On December 18, 2008 Union Bank of California, N.A. changed its name to Union Bank, N.A., and on February 2, 2009, the Court changed the case caption accordingly. (Order dated Feb. 2, 2009 (Docket No. 26))

Before the Court is the Bank's motion for partial summary judgment on its breach of contract and U.C.C. claims (Counts I and II of the Complaint), and CBS's motion to dismiss the Bank's claims for conversion, money had and received, and unjust enrichment (Counts III, IV, and V of the Complaint). For the reasons set forth below, the Bank's motion for partial summary judgment is DENIED without prejudice, and CBS's motion to dismiss the Bank's money had and received and unjust enrichment claims is DENIED without prejudice to renewal in the form of a summary judgment motion. CBS's motion to dismiss the Bank's conversion claim is GRANTED.

## I.      Procedural History

The Bank's Complaint alleges five causes of action: (1) breach of contract; (2) a violation of N.Y. U.C.C. § 4-A-402 and Cal. Com. Code § 11402; (3) conversion; (4) money had and received; and (5) unjust enrichment. On November 3, 2008, CBS filed a motion to dismiss the conversion, money had and received, and unjust enrichment counts. On January 30, 2009, the Bank moved for partial summary judgment on the first and second counts relating to breach of contract and the U.C.C./California Code violations. The parties have not yet conducted discovery.

## II.     Facts

On April 29, 2008, CBS "opened the Union Bank account for the purpose of assisting CBS in its management of short term, high liquidity investments for its day-to-day cash needs." (Affidavit of Ken Woltersdorf dated January 21, 2009 ("Woltersdorf Aff."), ¶¶ 6, 11) The parties' banking relationship was governed by the following agreements: the Select Institutional Money Funds Account Agreement, and an addendum to that agreement (collectively "SIMFAA"); and the Master Funds Transfer Agreement, and an addendum to that

agreement. (collectively "MFTA")  (Bank. R. 56.1 Statement, ¶¶ 2, 3)[2]  Under these agreements, CBS has the "sole responsibility for the investment, review, and management of all Property held in [the] Account" but the Bank has the authority to "to make or settle all purchases, sales, exchanges, investments and reinvestments of the Property held in [the] Account . . . upon receipt of, and pursuant to, [CBS's] instructions and according to the terms and conditions of this agreement. . . ."  (Cmplt., Ex. A at § 2.1)  The Reserve Fund was one of a number of funds offered by the Bank to CBS for investment through the account, and after opening its account, CBS "instructed Union Bank that its funds should be directed to investment in [the Reserve Fund]."  (Woltersdorf Aff., ¶ 12)  "Over the history of the account, CBS . . . cumulatively invested and withdrew more than $330 million."  (Id., ¶ 13)

        The events giving rise to this action began on September 11, 2008, when Ken Woltersdorf, a CBS employee, sent an email to Bank employee Cathy Yoell, stating:  "I just want to alert you that we expect to make a full redemption from the [Reserve Fund] on 9/15/08 due to significant disbursements expected on that date."  (Woltersdorf Aff., Ex. A5)  On September 15, 2008, Woltersdorf called the Bank and told Bank employee Ed Yee that "CBS was instructing Union Bank to make a full redemption of its interest in the [Reserve Fund] shares Union Bank held on its behalf and to withdraw the proceeds of that redemption, as [Woltersdorf] had indicated on September 11."  (Id., ¶ 16)  Woltersdorf also instructed Yee "to wire the proceeds of that transaction to CBS."  (Id.)

        At 10:09 a.m. PT on September 15, 2008, Yoell sent an email to Woltersdorf stating:  "The sale of $72,268,078.21 [R]eserve Primary Liquidity II has been completed

---

[2]  Unless otherwise noted, the facts stated in the Bank's Rule 56.1 Statement are admitted in CBS's Rule 56.1 Statement.

3

Order#663444; included with the principal will be the interest of $77,404.08 as well." (Woltersdorf Aff., Ex. A6)  At 10:45 a.m. PT, the Bank initiated a wire transfer of $72,345,482.29 to CBS's account at Chase.  (Bank. R. 56.1 Statement, ¶ 24; CBS R. 56.1 Statement, ¶ 24)  The wire transfer was received by Chase at 11:12 a.m. PT on September 15, 2008.  (Id., ¶ 26)  CBS alleges that it then used the $72,345,482.29 that the Bank had wired to pay a portion of more than "$200 million in operating expenses and other disbursements on September 15."  (Woltersdorf Aff., ¶ 22)  "The Reserve Fund [, however,] did not deposit the proceeds of CBS's redemption order with Union Bank on September 15, 2008."[3]  (Bank R. 56.1 Statement, ¶ 29)

"On September 16, [t]he Reserve [Fund] announced that as of 4:00 p.m. [ET] . . . on September 16, the net asset value ('NAV') for the Primary Fund would be $.097 per share, rather than the historically maintained NAV of $1.00 per share."  (Woltersdorf Aff., ¶ 23 (citing Ex. A7)).  On September 22, 2008, the Securities and Exchange Commission issued an order suspending all rights of redemption from the Reserve Fund.  (Woltersdorf Aff., Ex. A9)  After the Reserve Fund allegedly failed to forward the proceeds of CBS's investment to the Bank, the Bank demanded that CBS repay the Bank for its "advance" of funds.  (Id., ¶¶ 26, 27)  CBS refused.[4]  (Bank R. 56.1 Statement, ¶ 36)

Since that time, the Reserve Fund has made partial distributions from customer accounts.  For example, on October 31, 2008, the Reserve Fund distributed approximately 50%

---

[3] CBS alleges that, because it has taken no discovery, it has insufficient information to confirm or deny whether the Reserve Fund failed to wire the funds to the Bank.  (CBS R. 56.1 Statement, ¶ 29)

[4] CBS denies that these funds were an advance and further denies that any overdraft took place, but does not dispute that it has failed to repay the Bank the funds it wire transferred to CBS's Chase account on September 15, 2008.  (CBS R. 56.1 Statement, ¶ 36)

4

of the account balance of its customers' investments in the Reserve Fund, and on December 3, 2008, the Reserve Fund distributed approximately 57% of the then remaining account balance of its customers' investments in the Reserve Fund. (Affidavit of Marianne Bamonte dated Dec. 12, 2008, Ex. 6) The Bank asserts that as of the date of its motion, the Reserve Fund has distributed $57,040,069.90 to the Bank, but $15,305,412.39 has not yet been paid out.[5] (Bank R. 56.1 Statement, ¶¶ 33, 34)

### III. Union Bank's Motion for Partial Summary Judgment Will Be Denied Without Prejudice

Union Bank argues that it is entitled to summary judgment on its breach of contract and UCC claims because the parties' agreements unambiguously require CBS to repay any funds the Bank advances to CBS as an overdraft on CBS's account. The Bank relies on language from the MFTA providing:

> If you do not have sufficient funds available in your account(s) with us, we may, but are not required to complete fund transfers you request. In such cases, you agree to repay us immediately the amount of any overdraft and for any related fees. (Cmplt., Ex. B)

The Bank also cites the following language from the SIMFAA:

> Bank is authorized to charge the Client . . . for the funds necessary for Bank to complete any purchase or expense, to make any directed disbursement or to take any other action regarding the Account. . . . Client will pay back any fees or costs incurred . . . if funds in the Account are insufficient. . . . (Id., Ex. A, § 8.2)

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002); see also Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582, 305 F.3d 82, 86 (2d

---

[5] CBS maintains that it does not have sufficient information to confirm or deny whether the Bank received these amounts from the Reserve Fund. (CBS R. 56.1 Statement, ¶¶ 33, 34)

5

Cir. 2002). In addition, "[i]t is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract." <u>Omni Quartz, Ltd.</u>, 287 F.3d at 64. Thus, "if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." <u>Hatalmud v. Spellings</u>, 505 F.3d 139, 146 (2d Cir. 2007) (quoting <u>Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust. Co. of New York</u>, 375 F.3d 168, 177 (2d Cir. 2004)); <u>see also</u> <u>Palmieri v. Allstate Ins. Co.</u>, 445 F.3d 179, 187 (2d Cir. 2006) ("In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish.").

CBS argues, however, that it "is entitled to discovery to show that, among other things,"

> (a) the payment CBS received was <u>not</u> "an advance," as Union Bank contends,
>
> (b) the parties never intended for the contract to require repayment in this circumstance,
>
> (c) the course of dealing between the parties confirms CBS's interpretation of the contracts,
>
> (d) the industry practice in this situation is for the financial intermediary (Union Bank) to assume the risk of loss,
>
> (e) Union Bank itself understood that it bore the risk of loss in this situation, and
>
> (f) while Union Bank has submitted an affidavit stating that its "Custody Services Department" was not authorized to "take positions for the benefit of the Bank's portfolio," the bank itself <u>was</u> fully able to take beneficial ownership of The Primary Fund shares over which it held legal title, and the bank in fact did so with respect [to] the shares relevant to this dispute.

(CBS Summary Judgment Br. 2-3) (emphasis in original).

The problem with CBS's argument, however, is that this proposed discovery all addresses parol evidence – matters extrinsic to the governing agreements – and if the language of the governing agreements is clear and unambiguous, these matters are all irrelevant. See Omni Quartz, Ltd., 287 F.3d at 64. CBS does little to explain why the language relied on by the Bank – which appears to address a situation in which the Bank completes a fund transfer directed by a client even though the client's account does not contain sufficient funds – does not require CBS to repay the Bank the money it advanced to CBS in anticipation of receiving the redemption proceeds from the Reserve Fund.

Nonetheless, CBS correctly points out that the Second Circuit has stated that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Hellstrom v. United States Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000) (citations omitted). This is not one of those cases.

Because of the absence of any discovery, CBS has not had the opportunity to test basic alleged facts underlying this dispute and the Bank's litigation position. For example, the predicate for this lawsuit is that the Reserve Fund did not transmit to the Bank the proceeds of the redemption of CBS's Reserve Fund investment on September 15, 2008. CBS has not had the opportunity to take discovery on this fundamental point, however, and contends that it has insufficient information to admit or deny the Bank's allegation concerning it. (CBS R. 56.1 Statement, ¶ 29) Similarly, it is not clear from the record what CBS's account balance was at the Bank during the relevant time period. Assuming arguendo that the overdraft and insufficient funds provisions cited above

apply, it is necessary for the parties to establish what the balance was in CBS's account on, for example, September 15-17, 2008.  It also appears relevant to learn whether CBS's account was formally debited by the Bank on or after September 15, 2008, and whether the account showed a negative balance.

    Similarly, the Bank's contractual relationship with the Reserve Fund was a necessary predicate for the Bank to invest CBS's monies in that fund, but CBS has not had the opportunity to take discovery on this issue.  CBS has also stated that it lacks sufficient information to admit or deny certain potentially significant interactions between Bank employees (e.g., Yee's passing on of CBS's trade instructions to Yoell, and Yoell's interactions with Medina ) and Bank employee interactions with the Reserve Fund (e.g., Medina's interaction with the Reserve Fund concerning CBS's trade order).  (CBS R. 56.1 Statement, ¶¶ 18-20)

    Moreover, the cases the Bank relies on in arguing that summary judgment should be granted notwithstanding the absence of discovery – Caslterigg Master Invs. Ltd. v. Charys Holding Co., Inc., No. 07 Civ. 9742, 2008 WL 449690, at *2 (S.D.N.Y. Feb. 19, 2008) and Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) – are clearly distinguishable.  In Caslterigg, pre-discovery summary judgment was granted because the defendant admitted it was in default on contractual payments and did not submit a Rule 56(f) affidavit in opposition to the motion.  See 2008 WL 449690, at *2.  Similarly, in Wells Fargo, summary judgment was appropriate because the defendant did not file a Rule 56(f) affidavit and accordingly had waived any claim that further discovery was needed.  See 247 F. Supp. 2d at 360.  There is no such record here.

In sum, "[a] party opposing a motion for summary judgment 'must have had the opportunity to discover information that is essential to [its] opposition to the motion.'" Sutera v. Schering Corp., 73 F.3d 13, 18 (2d Cir. 1995) (reversing pre-discovery grant of summary judgment) (quoting Trebor Sportswear Co. v. Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989)) (quotations and citations omitted). Whether or not the discovery CBS takes will undermine the Bank's arguments concerning the applicability of the cited language from the agreements is not clear, but CBS is entitled to such an opportunity. The Bank's motion for partial summary judgment will be denied without prejudice.

## IV. CBS's Motion to Dismiss Will Be Granted in Part and Denied In Part

### A. The Conversion Claim Will Be Dismissed

The Bank's third cause of action is for conversion.[6] "To maintain a tort claim in addition to a claim of breach of contract, a plaintiff must (i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and not recoverable as contract damages." In re Actrade Fin. Tech. Ltd., 02 Civ. 16212 (ALG), 2007 WL 433358, at *4 (S.D.N.Y. Bankr. Feb. 5, 2007) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).

As to the first element, it is well-established that "[a] cause of action for conversion cannot be predicated on a mere breach of contract." Fesseha v. TD Waterhouse Investor Servs., Inc., 305 A.D.2d 268, 269, 761 N.Y.S.2d 22, 23 (1st Dep't 2003); see also Priolo Commc'ns, Inc. v. MCI Telecomm. Corp., 248 A.D.2d 453, 669 N.Y.S.2d 376, 377 (2d

---

[6] "According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44 (1995)).

9

Dep't 1998) (same); Key Bank of New York v. Grossi, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dep't 1996) (same). However, "[a] legal duty independent of contractual relations may be imposed by law as incident to the parties' relationship." Bellis v. The Tokio Marine & Fire Ins. Co., Ltd., No. 93 Civ. 6549 (DAB), 2002 WL 193149, at * 11 (S.D.N.Y. Feb. 7, 2002) (citing Sommer v. Fed. Signal Corp., 583 N.Y.S.2d 957, 961 (1992)). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Id. "A duty extraneous to the contract often exists where the contract accompanies some relation between the parties out of which arises a duty of affirmative care, as in cases involving bailor and bailee; public carrier and passenger; innkeeper and guest; lawyer and client; or principal and agent." Id.

The Bank fails to state a claim for conversion, however, because it does not allege that CBS owes it a legal duty, sounding in tort, independent of contractual relations. Nowhere in the Complaint does the Bank assert that the parties have a special relationship that gives rise to an independent duty and, as noted above, the Bank cannot base its conversion claim solely on its breach of contract claim.

Because the Bank fails to state a claim for conversion, its demand for punitive damages must likewise be dismissed. Punitive damages are not generally available for breach of contract or quasi-contract claims. See, e.g., Rocanova v. Equitable Life Assurance Soc'y of the United States, 83 N.Y.2d 603, 613 (1994) ("Punitive damages are not recoverable for an ordinary breach of contract" absent "egregious tortious conduct" that "was part of a pattern of similar conduct directed at the public generally"); Schwartz v. Victory Container Corp., 294 F. Supp. 866, 868 (S.D.N.Y. 1969) ("As a general rule, in the absence of statutory authority,

exemplary damages are not recoverable in actions for breach of contract, irrespective of motive on the part of defendant which prompted the breach.") (citation omitted); M'Baye v. World Boxing Ass'n, No. 05 Civ. 9581 (DC) , 2007 WL 844552, at *5 (S.D.N.Y. Mar. 21, 2007) ("New York does not allow punitive damages for unjust enrichment claims.") (citing Hutton v. Klabal, 726 F. Supp. 67, 73 (S.D.N.Y. 1989).

### B. The Fourth and Fifth Causes of Action for Money Had and Received and Unjust Enrichment Will Not Be Dismissed at This Time

Unjust enrichment and money had and received are quasi-contract claims.[7] "'Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort.'" Seiden Assocs., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 38 (S.D.N.Y. 1991) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co. See generally 70 N.Y.2d 382, 388 (1987)). With regard to quasi-contract claims, "[t]he contract is a mere fiction, a form imposed in order to adapt the case to a given remedy." Id. (quoting Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388). "The law creates [the remedy of quasi-contract], regardless of the intention of the parties, to assure a just and equitable result." Id. (quoting Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388).

CBS argues that the Bank's quasi-contract claims should be dismissed because the subject matter of this dispute is governed by the SIMFAA and the MFTA, and numerous

---

[7] "Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001). "To maintain an action for money had and received, New York law requires the following elements: '(1) defendant received money belonging to plaintiff; (2) defendant benefited from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money.'" Parsons & Whitmore Enterps. Corp. v. Schwartz, 387 F. Supp. 2d 368, 377 (S.D.N.Y. 2005) (quoting Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, 731 F.2d 112, 125 (2d Cir. 1984)).

courts have held that when an express contract encompasses the subject matter of a parties' dispute, quasi-contract claims must be dismissed.  (CBS Motion to Dismiss Br. 1, 5-8; CBS Reply Br. 1-7)  Because the parties' agreements concern a "money funds account" and this dispute arises from actions involving that account, CBS argues that these contracts are controlling and bar any quasi-contract claims.  Even where, as here, there is a dispute concerning interpretation of the parties' agreements, CBS maintains that quasi-contract claims must be dismissed at the inception of a litigation.  (Id.)

    The Bank counters that a plaintiff may plead quasi-contract claims in the alternative when there is a bona fide dispute as to whether the parties' agreements cover the subject matter in dispute, or where it is unclear whether those agreements cover a dispute. (Bank Motion to Dismiss Br. 1, 9-14)  More specifically, the Bank argues that if it is unclear whether the SIMFAA and the MFTA govern the parties' dispute, it should be allowed to proceed with its quasi-contract claims.

    Thus, the parties' arguments focus on whether the SIMFAA and MFTA cover the "subject matter" of this dispute.  CBS adopts a broad interpretation of the term "subject matter," while the Bank maintains that the agreements must specifically address what happened here in order for the agreements to bar its quasi-contract claims.  The Bank has the better argument at this stage of the case.

    The parties' emphasis on the phrase "subject matter" can be traced to the landmark New York Court of Appeals decision, <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u> <u>See generally</u> 70 N.Y.2d 382 (1987).  In <u>Clark-Fitzpatrick</u>, plaintiff sued the Long Island Rail Road and the Metropolitan Transit Authority for breach of contract, quasi-contract, gross negligence, and negligence.  <u>See</u> <u>id.</u> at 385-86.  Plaintiff had been awarded a contract to build a

new railroad on the Port Jefferson line and claimed that it had suffered cost overruns because of defendants' flawed engineering design, failure to acquire certain property rights, and failure to move various utility lines.  See id. at 385.  In affirming the dismissal of plaintiff's quasi-contract claim, the New York Court of Appeals explained that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Id. at 388.  But contrary to CBS's arguments, the court's analysis did not end there.  The Court explained that

> [i]t is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.
> Here, it is undisputed that the relationship between the parties was defined by a written contract, fully detailing all applicable terms and conditions, and specifically providing for project design changes with adjustments in compensation contemplated in light of those changes.  Id. at 389 (citations omitted) (emphasis added).

Therefore, the Clark-Fitzpatrick court held that the trial court properly dismissed the quasi-contract claim because it found that the contract at issue specifically addressed whether plaintiff should receive increased compensation because of project design changes flowing from defendants' poor engineering design and other failures.

Decisions interpreting Clark-Fitzpatrick have made clear that the predicate for dismissing quasi-contract claims is that the contract at issue "clearly covers the dispute between the parties."  Id.  For example, in Joseph Sternberg, Inc. v. Walber 36th St. Assocs., the plaintiff real estate broker claimed that the defendants had conspired to sell a building for a reduced price in order to deprive plaintiff of his broker's commission.  See 187 A.D.2d 225, 226-27, 594 N.Y.S.2d 144, 145 (1st Dep't 1993).  The parties had entered into a contract that provided that plaintiff would earn a commission if he arranged to sell the building for at least

13

$11.5 million.  See id. at 226.  Plaintiff further alleged that he found such a buyer, but that the owner and buyer conspired to deprive plaintiff of his commission by agreeing to a lower price, with a commission being paid to the owner's managing agent and general partner.  See id. at 227-28.  The defendants argued that "the contract barred recovery of a commission" on Plaintiff's quasi-contract claim. Id. at 227.

In holding that the trial court erred in dismissing Plaintiff's quasi-contract claim, the Court distinguished Clark-Fitzpatrick, noting that in that case "there was a written contract fully detailing all applicable terms and conditions of the agreement of the parties" whereas in Sternberg "the contract . . . is silent as to plaintiff's entitlement to a commission in the event a sale of the building occurred for a lesser price."  Id. at 227.  The court refused to dismiss the quasi-contract claim explaining:

> Obviously, if the brokerage agreement at issue had explicitly stated that, in the event the sale did not proceed at the agreed price, plaintiff would not be entitled to any commission, it would be indisputable that nothing short of a sale at that price would entitle plaintiff to a commission.  The contract, however, does not so state and is silent as to the plaintiff's entitlement to a commission in the event a sale occurred for a lesser price.  Id.  at 228.

Similarly, in Rabin v. MONY Life Ins. Co., plaintiff sued the defendant for, inter alia, breach of contract and unjust enrichment, alleging that it had violated the terms of certain whole-life policies by paying the cash value proceeds of these policies into a "MONY Market" checking account rather than directly to policy holders.  See No. 06 Civ. 775 (LTS), 2007 WL 737474, at *1 (S.D.N.Y. Mar. 8, 2007).  The Court denied defendant's motion to dismiss the unjust enrichment claim because there was an issue "as to whether the terms of the parties' agreement covered such matters as the propriety of MONY's establishment of a payment vehicle that allegedly benefitted MONY by . . . enabling MONY to receive fees or

14

other remuneration . . . . from [that] money fund." Id. at *5 (record quotation omitted). Thus, the Rabin court declined to dismiss plaintiff's unjust enrichment claim on a motion to dismiss, because it was not clear whether the insurance policies at issue prohibited MONY from using the MONY market checking account device to distribute cash value proceeds.

Here, and unlike in the cases relied on by CBS,[8] it is not appropriate for this Court to rule – at the inception of this case and as a matter of law – that the parties' agreements

---

[8] CBS relies on numerous cases, which are distinguishable, in which courts dismissed quasi-contract claims after determining that the contracts before them unambiguously addressed the precise issue in dispute. See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 587 (2d Cir. 2006) (affirming the dismissal of an unjust enrichment claim on summary judgment – after an in-depth analysis of certain written and implied-in-fact contracts – because an enforceable written contract "governed the particular subject matter of this case," i.e. the applicable hospital reimbursement rates); Liu v. Beth Israel Med. Ctr., No. 02 Civ. 2034 (DLC), 2003 WL 21488081, at *5 (S.D.N.Y. Jun. 26, 2003) (granting summary judgment against unjust enrichment claim and finding that Sternberg was inapplicable because the action was not a case where there was "'a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue'") (quoting Sternberg, 187 A.D.2d at 228); Nat'l Westminster Bank PLC v. Grant Prideco, Inc., 261 F. Supp. 2d 265, 275 (S.D.N.Y. 2003) (dismissing unjust enrichment claim because "[t]he allegations of the unjust enrichment count relate solely to the contracts" and "'the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties'") (quoting Clark-Fitzpatrick, Inc., 70 N.Y.2d at 389); AdiPar Ltd. v. PLD Int'l Corp., No. 01 Civ. 765 (MBM), 2002 WL 31740622, at *12 (S.D.N.Y. Dec. 6, 2002) (dismissing unjust enrichment claim and distinguishing Sternberg because "the contract at issue . . . spells out the terms of the supply relationship between [the parties]"); Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co., 224 F. Supp. 2d 520, 540 (W.D.N.Y. 2002) (dismissing quantum meruit claim because "the parties expressly agreed that defendant had the right to unilaterally change the scope of the work" and "how much money plaintiff should be paid for doing the work, and whether or not its time for performance should have been extended" are "issues [that were] provided for in the contract"); Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (2005) ("Given that the disputed terms and conditions fall entirely within the insurance contract, there is no valid claim for unjust enrichment."); Fesseha, 305 A.D.2d at 268-69 (dismissing a claim for money had and received – when plaintiff claimed defendant unfairly liquidated its securities without notice and without an opportunity to cure – after the court found "that the parties unambiguously agreed to grant defendant . . . the right to liquidate securities in plaintiff customer's account"); Phoenix Garden Restaurant, Inc. v. Chu, 245 A.D.2d 164, 166, 667 N.Y.S.2d 20, 23 (1st Dep't 1997) (dismissing a claim for money had and received because "the second rider to the second lease specifically provides that, in the event of plaintiff tenant's default under the lease,

15

govern the instant dispute.  Although both sides argue that they should prevail under the SIMFAA and MFTA (Bank Summary Judgment Br. 12-16; CBS Summary Judgment Br. 11-12, 16) – the Court could later conclude that these agreements do not address the events that took place here.

Indeed, CBS has already raised several arguments indicating that resolution of the parties' dispute requires going outside the four corners of their agreements.  For example, CBS argues that "it is entitled to discovery" concerning numerous matters that constitute parol evidence – such as the parties' course of dealing and industry practice.  (CBS Summary Judgment Br. 2-3)  As noted above, if the plain language of the agreements mandated judgment for CBS, reference to parol evidence would be unnecessary.  Moreover, CBS argues that Article 8 of the New York U.C.C., and not the parties' agreements, controls this dispute.  (Id., 14 n.2; see also Id., 16 ("Thus, the New York statute that governs the relationship between Union Bank and CBS provides that CBS's security entitlement has been extinguished, and that CBS no longer holds any risk of loss.  Any attempt by Union Bank to stretch inapplicable provisions in the contract to achieve a different result is necessarily unreasonable.")).  CBS has also submitted lengthy expert reports in support of its assertion that the U.C.C. "governs the relationship between Union Bank and CBS."  (Id., 16; CBS Affidavits & Expert Reports, Exs. C, D)  Because it has already become clear that at least one of the parties will argue that resolution of this dispute requires going outside the four corners of the parties' agreements, the Court cannot determine as a matter of law and at the inception of this litigation that this dispute will be resolved through application of the SIMFAA and MFTA.  Accordingly, CBS's motion

---

defendant landlord may retain the entire balance of the $250,000 additional security deposit or 'key money'").

16

to dismiss the fourth and fifth causes of action will be denied without prejudice to renewal on a summary judgment motion.

## CONCLUSION

For the reasons set forth above, the Bank's motion for partial summary judgment is DENIED without prejudice; CBS's motion to dismiss the Bank's third cause of action for conversion, as well as the Bank's demand for punitive damages, is GRANTED; and CBS's motion to dismiss the fourth and fifth causes of action for money had and received and unjust enrichment is DENIED without prejudice to renewal in the form of a summary judgment motion.

The Clerk of the Court is directed to terminate the motions. (Docket Nos. 5, 16)

Dated:　　　New York, New York
　　　　　　June 9, 2009

　　　　　　　　　　　　　　SO ORDERED.

　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Paul G. Gardephe
　　　　　　　　　　　　　　United States District Judge